IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 1:22-CR-00409-SAG-1 |
| | § | |
| WILSON ARTURO | § | |
| CONSTANZA-GALDOMEZ *et al.* | § | |

## REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO STRIKE ITS NOTICE OF INTENT TO SEEK THE DEATH PENALTY

Wilson Arturo Constanza-Galdomez submits this reply to the Government's Response in Opposition to Defendants' Motions to Strike Notices of Intent to Seek the Death Penalty.

## I. Introduction

Before addressing several specific arguments made by the government, Mr. Constanza-Galdomez highlights what the government's response has *not* disputed:

• The factual assertions made in his motion to strike concerning the factual and procedural history of this case (including the actions of the Department of Justice from June 2020 to May 2025);

• The exhibits attached to his motion to strike, including the declarations of Susan Garvey, Julie Reamy, Matthew Rubenstein, David A. Ruhnke, and Russell Stetler;[1]

• The specific, detailed recommendations of the ABA's 2003 and 2008 guidelines for defense counsel in death penalty cases;

• The policies of the Judicial Conference of the U.S. Courts concerning federal death penalty cases (including its endorsement of the ABA guidelines); and

• That this Court is bound by *United States v. Ferebe*, 332 F.3d 722 (4th Cir. 2003) – not by decisions of courts outside the Fourth Circuit.

The government expresses its disagreement with *Ferebe* "for purposes of preserving it for possible further review." Government's Response, at 4 n.4. In particular, the government contends

---

[1] Attached as **Exhibit A** is an email sent to one of this Court's staff members (whose name is redacted) by AUSA Alex Kalim, in which he stated that the "government does not believe a hearing is necessary as we do not intend to challenge any of the declarations" attached to Mr. Constanza-Galdomez's motion to strike and codefendants' motions to adopt Mr. Constanza-Galdomez's motion to strike.

that "a continuance is the proper remedy if the defendant believes a notice is filed too close to trial" – something, the government concedes, *Ferebe* does not permit. *Id.* Assuming *arguendo* that the government were correct that ordinarily a continuance would cure any prejudice to a capital defendant when the government's death penalty notice is filed too close to an established trial date, that argument would lack merit in the present case. As explained in the motion to strike, the government's actions – including its formal notice in April 2024 that it would *not* seek the death penalty followed 13 months later by a 180-degree change in position – caused irreparable harm to Mr. Constanza-Galdomez that no forward-looking continuance of the trial date could repair.

Also essential to point out at the outset of this reply is that the government effectively asks this Court to give its imprimatur to the creation of an entirely new regime for administration of the federal death penalty, in which the government would be empowered to keep both defendants and district courts guessing about whether the government will seek the death penalty – even after the government has formally stated that it would *not* seek the death penalty – until shortly before a firmly scheduled noncapital trial date. And, in that new regime, defendants and courts would be powerless to prevent such uncertainty. Permitting the government to proceed in that manner would work a radical change to longstanding norms and practices, reflected in federal statutes and endorsed by the Judicial Conference, going back several decades. Moreover, it would inject arbitrariness and fundamental unfairness into the area of our legal system in which courts "'as much as is humanly possible'" should take "'extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee . . . that the sentence was not imposed out of whim, passion, prejudice, or mistake.'" *Caldwell v. Mississippi*, 472 U.S. 320, 329 n.2 (1985) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 117-18 (1982) (O'Connor, J.,

concurring)); *see also Saffle v. Parks*, 494 U.S. 484, 493 (1990) ("[A]bove all, capital sentencing must be reliable, accurate, and nonarbitrary").

In addition to causing such unfairness and arbitrariness, the government's proposed regime is simply not administrable and, indeed, would be entirely disruptive to the federal judiciary. It effectively would require the courts to appoint two lawyers (at least one of whom qualifies as a "learned counsel"), a mitigation specialist, and capital experts for the *entire duration* of any potentially death-eligible case and administer a correspondingly large budget (including for travel expenses) – thus imposing vast, potentially limitless costs on the federal courts. And it would give the government unilateral authority to scuttle any scheduled non-capital trial in a potentially death-eligible case, no matter how much the court and defense had planned with that date in mind or how long the defendant had been asserting his speedy trial rights.

Our judicial system has many firm rules intended to promote fairness, predictability, and judicial efficiency – e.g., procedural rules requiring the filing of key documents (such as pretrial motions and notices of appeal) by certain dates (the noncompliance with which causes the loss of the right to file such documents); statutes of limitation; and speedy trial provisions. Of all areas in our legal system, it is critical that the government's administration of the death penalty should be subject to such rules.[2]

---

[2] The government erroneously argues that this Court lacks authority under the federal courts' "supervisory authority" to create a "procedural rule" that prohibits the death penalty when the government previously disclaimed an intent to seek it in a formal filing due to the fact that what the defendants "are advocating for is substantive because it would place a substantive limit on what the government may do once it files a no-seek notice . . . ." Government's Response at 10-11. The proposed "supervisory authority" rule in the motion to strike is not "substantive." Instead, the motion proposes a *procedure* whereby the government's failure to comply has case-related consequences – just like other "supervisory authority" procedural rules, such as the procedural rule requiring prompt presentation of an arrested defendant before a judicial officer, the noncompliance with which by the government results in suppression of a confession (and potential dismissal of the charges). *See Corley v. United States*, 556 U.S. 303 (2009) (reaffirming the "*McNabb-Mallory* rule," a product of the Supreme Court's supervisory authority). Mr. Constanza-Galdomez submits that this Court need not adopt such a "supervisory authority" rule and, instead, should dismiss in applying 18 U.S.C. § 3593(a) and, alternatively, as a matter of waiver and/or estoppel. He notes that this Court may adopt a "supervisory authority" procedural rule as an independent basis for striking the government's May 16, 2025 notice.

3

## II. Arguments in Reply

**A. The May 16, 2025 Notice Was Untimely Because Mr. Constanza-Galdomez Was Not Previously on Notice to Prepare for a Capital Trial and Does Not Have the Time and Resources to Prepare for a Capital Trial Beginning on September 2, 2025.**

The government does not dispute that 18 U.S.C. § 3593(a) mandates a *timely* death penalty notice. *See* Government's Response, at 3. It instead contends that its notice given 109 days before the firm non-capital trial date of September 2, 2025, was timely. *Id.* at 4. The government contends specifically that:

> Because the Defendants have been preparing to defend themselves against these murder allegations for the past 2.5-plus years, the nature of the charges, which have largely stayed the same, weighs in favor of concluding that the notices are reasonably timely. . . . [I]t cannot be said that the Defendants – each represented by their own counsel – do not have adequate time to prepare their defenses. They repeatedly assert that they must 'start entirely from scratch' now that there will be a separate penalty phase (where death is on the table) if they are convicted at the guilt phase. . . . [H]ere, counsel have had more than 2.5 years to investigate and prepare to defend against virtually the same set of underlying facts [in the original indictment]. The onus should be on the Defendants to explain why preparing for capital trials now take substantially longer, but instead of doing so, they hide behind general statements about lengthy preparations that could apply to any case, and thus reveal nothing about why the notices should be deemed untimely in this case.

Government's Response, at 5, 7-8.

Other than making the bald claim that the motion to strike engages in "hyperbole" and "hides behind" the Judicial-Conference-endorsed ABA standards,[3] the government entirely fails to account for (1) the congressionally-mandated requirement of two counsel for a capital defendant (including at least one "learned counsel"); (2) the ABA guidelines' recognition that preparing for a defense to murder charges where the death penalty is sought is qualitatively different from preparing for a defense when the death penalty is not being sought (and takes a great deal more time and resources); and (3) the *uncontroverted* declarations of Matthew Rubenstein, David A.

---
[3] Government's Response, at 8.

Ruhnke, and Russell Stetler about the inordinate amount of preparation required for an adequate defense in a capital trial (including, most importantly, developing mitigation for the capital sentencing phase), especially for a capital defendant from a foreign country like El Salvador. Those three things clearly demonstrate that 109 days is a woefully insufficient time in which to prepare for a capital trial when the various requirements for capital defense have not existed beforehand (and still do not exist to this day – now only **85 days** before the September 2 trial date).

Forcing this case to a death penalty trial on September 2 would substantially increase the odds of a death sentence for the three defendants in this case because the amount of time and resources devoted to preparing for the defense would be significantly less than in a typical federal capital prosecution with adequate time and resources to prepare. *Cf. Report to the Committee on Defender Services Judicial Conference of the United States: Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases*, at p. x (2010) (noting a "a strong association between a lower cost defense representation and an increased likelihood of a death sentence at trial" – "[f]or trial cases in which defense spending was among the lowest one-third of all trial cases, the rate of death sentencing was 44 percent [versus] cases in which defense resources were in the remaining two-thirds of cost, the likelihood of a death sentence was 19 percent."), https://www.uscourts.gov/update-cost-and-quality-defense-representation-federal-death-penalty-cases.

Concerning the aggravating evidence that it intends to introduce, the government asserts that:

> In preparing to defend against those allegations in the original indictment, the Defendants also prepared to defend against most of the aggravating factors in the Death Notices. Perhaps only the Victims' relative youth and the injury, harm, and loss the Victims' family and friends suffered were not expressly alleged in the original indictment, but those aggravating factors were already known to the Defendants. They certainly knew the Victims' ages from discovery. And they

certainly were not blind to victim impact as an important sentencing factor in any case involving allegations of intentional murder. *Cf. Payne v. Tennessee*, 501 U.S. 808, 820 (1991). . . . Nor have they articulated how additional time before trial would help them prepare for this aggravating factor.

Government's Response, at 6.

That argument fails to recognize that preparing for *non-capital* aggravating factors under the sentencing guidelines and 18 U.S.C. § 3553(a) is qualitatively different (in terms of pretrial preparation) from preparing for *capital* aggravating factors. *See* ABA's 2003 guidelines, 31 HOFSTRA L. REV. at 1064-66.

The government further makes the nonsensical argument that: "Although the Defendants contend that significant time and resources would have to be devoted to defend against those *aggravating factors*, much of the *mitigation investigation* is inherent to formulating defenses to what was alleged in the original indictment." Government's Response, at 6 (emphasis added). Preparing for capital mitigation and preparing to defend against capital aggravation are entirely different things. As the 2008 ABA standards discuss in detail, preparation for capital mitigation requires a great deal of time and resources in investigating the background of the defendant and his family. *See* 36 HOFSTRA L. REV. at 689-92. None of that work concerns aggravating factors.

The government also contends that, the defendants "indicate that they must rethink their defenses because they should not take 'contradictory positions' at the guilt and penalty phases of the capital trial. . . . But they do not say that they were planning to take contradictory positions at trial and sentencing before the death notices were filed." Government's Response, at 7. That argument fails to understand the point made by the ABA guidelines about how bifurcated capital cases differ from non-capital cases with respect to how capital defense counsel must have an "integrated defense theory" at both the guilt-innocence and capital sentencing phases that would not necessarily exist at a non-capital trial. *See* ABA Guideline 10.10.1 ("Trial Preparation

Overall") (Commentary), *reprinted in* 31 HOFSTRA L. REV. at 1047-48; *see also Florida v. Nixon*, 543 U.S. 175, 192 (2004) ("[I]n a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed.").

For all these reasons, the government's notice is untimely under 18 U.S.C. § 3593(a). In addition, as stated in the motion to strike, the government has failed to show good cause for its filing (if this Court treats the government's notice as an amendment to its August 2024 notice).

**B. None of the Cases Cited by the Government Involved the Unprecedented Circumstances of this Case.**

The government argues that:

> . . . [C]ourts have not set a brightline rule for the reasonability of notice filing, approving as reasonable the filing of a death notice in a substantially similar case 113 days before trial. *See Le*, 311 F. Supp. 2d at 534-35 (finding 113 days reasonable); *see also Ferebe*, 332 F.3d at 725 (noting a nationwide average of 8.4 months); *United States v. Wilk*, 452 F.3d 1208, 1221 (11th Cir. 2006) (finding six months reasonable); *United States v. Breeden*, 366 F.3d 369, 374 (4th Cir. 2004) (same); *United States v. Ponder*, 347 F. Supp. 2d 256, 270 (E.D. Va. 2004) (finding four months reasonable); *cf. United States v. McGriff*, 427 F. Supp. 2d 253, 270-72 (E.D.N.Y. 2006) (finding 12 days unreasonable but granting continuance to cure prejudice).

Government's Response, at 8.

Of course, none of those cases involved the unprecedented scenario presented in the instant case – where the government never had brought capital charges until nearly five years after the defendants' arrest and had affirmatively *waived* the death penalty 13 months before the government diametrically changed its position on the death penalty a mere 109 days before a firm trial date (when no learned counsel, mitigation experts, or capital experts ever had been appointed). And in *all* of the cases cited by the government in which sufficient notice was found – *Le*, *Wilk*, *Breeden*, and *Ponder* – the capital defendants had been charged with capital offenses and appointed two counsel (including at least one learned counsel) well before the government filed its original or amended death penalty notice and also before the scheduled trial. *See Wilks*, 452 F.3d at 1211

7

(noting that, "[f]rom the start, this case was considered a potential death penalty case");[4] *Breeden*, 366 F.3d at 372 (noting the capital charges were filed in February 2003; the government's notice of intent to seek the death penalty was filed on July 7, 2003; and the trial scheduled to commence on February 9, 2004 – nearly a year after learned counsel was appointed);[5] *Ponder*, 347 F. Supp. 2d at 259-61 (noting two attorneys, including a learned counsel, were appointed shortly after the defendant's arrest on capital charges on October 3, 2004; the government's death penalty notice filed on November 18, 2004; and the trial was scheduled for May 31, 2005 – eight months after learned counsel had been appointed).

The government's characterizing *Le* as "substantially similar" is misleading – the 113-day period in that case was deemed not unreasonable because capital charges had been filed and two defense counsel (including one learned counsel) had been appointed *six months* before the scheduled trial date. *Le*, 311 F. Supp. 2d at 529-30. Also noteworthy is that the court in *Le*, in a subsequent opinion, held that the government's *amended* death notice (filed 94 days before the trial) was untimely even though it only added new aggravating factors. *United States v. Le*, 316 F. Supp.2d 343 (E.D. Va. 2004).

It is also worth pointing out that the court in *Le* (like the Fourth Circuit in *Ferebe*) never specifically discussed the extensive time and resources required to develop capital *mitigation*. Presumably, Le's and Ferebe's attorneys did not argue that point in moving to strike the government's death penalty notices because the defendants had learned counsel and related

---

[4] The district court's decision in *Wilks* noted that two counsel for the defendant, including a learned counsel, were appointed *before* he was indicted for capital charges in October 2004; the government's death penalty notice was filed on February 18, 2005 (and amended on March 29, 2005); and the trial was scheduled on August 29, 2005 – over 10 months after the appointment of learned counsel). *United States v. Wilks*, 366 F. Supp.2d 1178, 1180-82 (S.D. Fla. 2005).

[5] Although not mentioned in the Fourth Circuit's opinion, the district court appointed the capital defendants "learned counsel" soon after their indictment in February 2003. *See* **Exhibit B** (district court docket sheet in *Breeden*).

8

resources already in place when the government gave its formal notice. As addressed in Mr. Constanza-Galdomez's motion to strike, capital mitigation takes an extensive amount of time and resources, as recognized by the 2003 and (especially) 2008 ABA guidelines. *Le* (like *Ferebe*) was decided before the 2008 guidelines. Significantly, the four enumerated *Ferebe* factors are a "non-exhaustive list of factors" for courts to consider. *United States v. Breeden*, 366 F.3d 369, 374 (4th Cir. 2004). Therefore, in this Court's timeliness analysis, it should put great weight on the fact that Mr. Constanza-Galdomez has not had the time or resources to prepare for capital mitigation.

C. **The Government's Argument that Less (Not More) Time is Required for Capital Case Preparation Since *Ferebe* Was Decided in 2003 Is Totally Meritless.**

The government contends that:

Back in 2003, when research and investigations were still more analog than digital, the defendant in *Ferebe* pointed to the ["]average of 8.4 months remaining before trial["] as an adequate amount of time to prepare for a capital case. *See* 332 F.3d at 725. So, it is very hard to see how the tremendous technological advances of the past two decades have made it substantially more difficult to prepare for a capital trial – especially where, as here, counsel have had more than 2.5 years to investigate and prepare to defend against virtually the same set of underlying facts.

Government's Response, at 8.

That argument entirely ignores both the 2003 and 2008 ABA guidelines and the *uncontroverted* expert declarations about how much time it takes to properly prepare for a capital trial (even with learned counsel, a mitigation specialist, and capital experts) – particularly when the defendant spent his formative years in a foreign country like El Salvador. "Technological advances" since 2003 (e.g., Zoom) have little to do with conducting an adequate mitigation investigation, particularly when much of that work has to occur abroad.[6]

---

[6] *See, e.g.*, 36 HOFSTRA L. REV. at 689 ("Team members **must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death**. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.") (emphasis added).

9

The 2003 and 2008 guidelines reflect a heightened standard of practice in death penalty cases existing in the modern era. Since *Ferebe* was decided, the average time between the authorization of a capital prosecution by the Attorney General and the start of a capital trial has grown to ***28 months*** – over three times the average amount of time cited in *Ferebe* in 2003. *See* Motion to Strike, Appendix D.

**D. The Day After the Motion to Strike Was Filed, the Government Produced a Significant Amount of Additional Discovery Related to the Guilt-Innocence Phase.**

In its response, filed on June 4, 2025, the government stated that it "agrees with Constanza-Galdomez that the overwhelming majority of discovery in this case has been tendered. Doc. No 101, at 24." Government's Response, at 8 (referring to the statement made on page 24 of the May 27 motion to strike: "the government appears to have provided the majority and perhaps all of the discovery related to the guilt-innocence phase"). On May 28, *the day after the motion to strike was filed*, the government made its third, belated discovery production – related to guilt-phase evidence (i.e., not capital sentencing phase discovery). That production appears to be over 40 gigabytes. *See* **Exhibit C**. That belated production of a substantial amount of discovery militates in favor of striking the government's May 16, 2025 notice. *See Ferebe*, 332 F.3d at 737.

**E. The Government Both Waived, and Is Estopped from Asserting, Its Ability to Seek the Death Penalty.**

The government disputes Mr. Constanza-Galdomez's related but distinct arguments that the government both has waived its ability to seek the death penalty and also is estopped from seeking it – based on its April 2024 formal notice that it was *not* seeking the death penalty. Government's Response, at 9-10, 11-14. The government errs. Whether under waiver or estoppel principles, the government's April 2024 formally-announced decision was "irrevocable." *United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003).

Seeking to renege on its April 2024 notice with impunity, the government contends that: "[J]ust as this Court possesses the 'inherent power' to 'reconsider' its decisions, *United States v. Breit*, 754 F.3d 526, 530 (4th Cir. 1985), so do the Attorney General and Department of Justice because '[t]he power to reconsider is inherent in the power to decide.' *In re Vivint, Inc.*, 14 F.4th 1342, 1351 (Fed. Cir. 2021)." Government's Response, at 9-10. The government is wrong.

A *court*'s inherent authority to reconsider a judicial ruling is qualitatively different from a *party's* diametric change of position in litigation. Waiver and estoppel principles do not apply to judges; but they do apply to litigants. And they apply to the government for the reasons set forth in the motion to strike. *See also Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 24 (2020) ("Justice Holmes famously wrote that '[m]en must turn square corners when they deal with the Government.' . . . But it is also true, particularly when so much is at stake, that 'the Government should turn square corners in dealing with the people.'") (citations omitted); *see also Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970) ("To say to these appellants, 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government").

1. **Waiver**

The government further contends that "no one has ever suggested that by filing one notice the Attorney General waived the right to reconsider and reverse that decision, which is all that Attorney General Bondi has done here" – citing *United States v. Peoples*, 360 F.3d 892, 896 (8th Cir. 2004), as "affirming the denial of a motion to strike a death notice where the United States filed the death notice, withdrew it at the penalty phase of the original trial, and then refiled it when the case was later retried." Government's Response, at 10. *Peoples* is clearly distinguishable from the present case for at least three reasons. First, the only legal issue litigated in *Peoples* was a double jeopardy issue – not any of the legal issues at issue in the present case. Second, there was

no detrimental reliance by the defendant in *Peoples*, as learned counsel had been appointed long before the capital trial and thus had adequate time to prepare for a capital sentencing.[7] Indeed, the government withdrew its death penalty notice *during the capital sentencing* after a separate capital jury was unable to reach a verdict, resulting in an automatic life sentence for a codefendant deemed more culpable than Peoples by the prosecution. *Peoples*, 360 F.2d at 894; *see also* Brief of Appellee, *United States v. Peoples*, No. 03-1207, 2003 WL 23062888, at *1, *8 (filed March 2003) (discussing the prosecution's decision to withdraw its notice to seek the death penalty against Peoples). Third, the government only filed a second notice to seek the death penalty after the defendant (Peoples) and his codefendant (Lightfoot) had successfully appealed and obtained a reversal of their capital murder convictions (and life sentences). *Peoples*, 360 F.2d at 894.

Rather than citing *Peoples*, the government should have discussed the recent decision in *Spurlock* (addressed in the motion to strike), which in fact did more than merely "suggest" that the Attorney General had waived the right to reconsider and reverse that decision; it *held* that the current Attorney General was not permitted to reconsider the former Attorney General's decision not to seek the death penalty in that case.

The government also states that "it is difficult to see how the decision not to seek death in a case involving no capital charges, see ECF No. 1; *see also* 18 U.S.C. § 1963(a), waives the right to seek death on subsequently filed capital charges." Government's Response, at 10. The fact that the waiver occurred when only noncapital RICO charges were pending is irrelevant. As discussed in the motion to strike, the *Justice Manual* expressly states that the Capital Case Section makes the decision about whether to bring capital charges and whether to seek the death penalty at the same time. *See* Motion to Strike, at 32 & n.29, 34. The Capital Case Section's decision made in

---

[7] The district court docket sheet in *Peoples* (4:98-cr-00149-FJG, W.D. Mo., ECF Nos. 19 & 20) shows that learned counsel was appointed over a year before the capital trial began.

April 2024 necessarily meant that the government would not supersede the original indictment with capital charges coupled with a notice to seek the death penalty. Although AUSA Smolkin reserved the government's right to bring § 1959(a) charges (in AUSA Smolkin's email in April 2024),[8] he expressly noted that the government was not going to seek the death penalty.

### 2. Estoppel

The government erroneously contends that, because it has not changed positions on an "issue of fact," judicial estoppel does not apply. Government's Response, at 12 (citing *Zinkand v. Brown*, 478 F.2d 634, 638 (4th Cir. 2007)). The Supreme Court has not limited judicial estoppel to "factual" issues. *New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001) (referring to a party's changed "position" in litigation); *see also Spurlock*, 2025 WL 1360499, at *17.

The government also erroneously argues that judicial estoppel does not apply because "[t]he prior position not to seek the death penalty was not formally accepted by the Court." Government's Response, at 14. This government's formal abandonment of its ability to seek the death penalty was effectively "accepted" by this Court. Among other things, this Court did not appoint two counsel per defendant (including a learned counsel), and this Court managed the case as if it were a non-capital case – including by setting a September 2, 2025 non-capital trial date.

Regarding promissory estoppel, the government asserts that:

> [A]t no point did the Government make an enforceable promise. Deciding not to seek certain charges is not a promise not to do so. . . . [Constanza-Galdomez] mischaracterize[es] the Government's prior no-seek notice as a 'promise' or likening the no-seek notice to a plea agreement. As explained above, the no-seek notice was not a promise. It was not negotiated for consideration, making it an agreement, and nothing in § 3593(a) prevents the Government from reconsidering its decision whether to seek the death penalty or not.

Government's Response, at 11-12.

---

[8] That email is attached as an appendix to Julie Reamy's declaration (attached as Exhibit B to the motion to strike).

It is blackletter law that promissory estoppel does not require an "enforceable" promise supported by "consideration." Instead, the two elements of promissory estoppel are a "promise" and detrimental reliance. *Black's* defines "promise" as "[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made." BLACK'S LAW DICTIONARY (10th ed. 2014). What the government said – both in a formal filing and also in an email from AUSA Smolkin – in April 2024 was a "promise" under that definition. Promissory estoppel thus applies here.

Finally, the Government claims that it "has not engaged in any conduct that should merit a sanction, much less one that would have a preclusive impact on its ability to pursue the full panoply of penal consequences, particularly when any potential timeliness issue could be cured by a continuance." Government's Response, at 11. As the court stated in *Spurlock*, the government's similar 180-degree change in position in that case – where the defendant and court relied on the prior formal representation – "play[ed] fast and loose" with the court. *Spurlock*, 2025 WL 1360499, at *20. That misconduct warrants striking the government's May 16, 2025 notice.

**F. Allowing the Government to Proceed on its Death Penalty Notice Would Be Unconstitutional.**

The government briefly contends that: (1) "[T]he decision to reconsider was neither arbitrary nor capricious" – and thus does not violate due process; and (2) "the decision to reconsider a no-seek decision is neither cruel nor unusual." Government's Response, at 14, 16. The government fails to address the case law cited in the motion to strike and, instead, simply contends that Mr. Constanza-Galdomez has cited no cases specifically holding that what occurred in this case violates due process or the Eighth Amendment. Of course, there is no precedent addressing these constitutional issues because what has occurred in this case (and *Spurlock*) is a first for the Justice Department. The unprecedented nature of the government's actions is evidence of its arbitrary

14

and unusual nature. And the inherent cruelty of formally advising a defendant that the government will not pursue capital punishment and then abruptly changing that decision 13 months later without any intervening developments except a change in administrations is self-evident.

**G. The Government's Reconsideration of Its Decision to Seek the Death Penalty Based on the Defendants' Lack of Immigration Status Is an Equal Protection Violation.**

Seeking to recharacterize the President and Attorney General's publicly-announced policy to prioritize the death penalty for potential capital defendants "present in the United States illegally" as a policy merely focusing on potential capital defendants with "prior criminal conduct," the government erroneously asserts that its policy is not an equal protection violation. Government's Response, at 16. In the event that this Court does not strike the government's death penalty notice on another ground set forth in the motion to strike, Mr. Constanza-Galdomez requests discovery (including internal communications about the government's policy) and an evidentiary hearing to determine the actual rationale for the policy. He has made out a prima facie case that the government's decision to reconsider was based on his lack of immigration status.

## CONCLUSION

For the foregoing reasons, this Court should strike the government's notice to seek the death penalty.

Respectfully submitted,

Julie M. Reamy  
District of Maryland Bar # 28232  
juliereamy@gmail.com  
One Olympic Place, Suite 900  
Towson, MD 21204  
(410) 605-0000  

/s/ *Brent E. Newton*  
Brent E. Newton  
District of Maryland Bar # 21304  
19 Treworthy Road  
Gaithersburg, MD 20878  
brentevannewton@gmail.com  
202-975-9105  

**Counsel for Defendant Wilson Arturo Constanza-Galdomez**

# CERTIFICATE OF SERVICE

      On June 9, 2025, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

                                                  /s/ *Brent E. Newton*
                                                  Brent E. Newton