IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| v. | * |
| Wilson Arturo CONSTANZA-Galdomez, <br>    a.k.a. Humilde, <br>    a.k.a. Marco Saravia, | *    CRIMINAL NO. 1:22-CR-409-SAG |
| Edis Omar VALENZUELA-Rodriguez, <br>    a.k.a. Little Felon, | * |
| Jonathan PESQUERA-Puerto, <br>    a.k.a. Truney, | * |
| Defendants. | * |

* * * * * * * * * * * * * * * * * * * * * * * * *

**GOVERNMENT'S CONSOLIDATED MOTIONS IN LIMINE**

The United States of America, through its undersigned attorneys, Kelly O. Hayes, United States Attorney for the District of Maryland, and Alex Kalim, Assistant United States Attorney, respectfully moves in *limine* for orders: (i) prohibiting the Defense from inquiring into the location of witnesses and witnesses' families; and (ii) precluding the Defense from presenting evidence or argument regarding the potential penalties the Defendants face if convicted, as well as the penalties the cooperating witnesses faced absent cooperation.

**BACKGROUND**

As alleged in the Superseding Indictment, this trial is about the Defendants' affiliation with *La Mara Salvatrucha* ("MS-13") and certain acts of violence they perpetrated in furtherance of the gang. Members of MS-13 frequently engage in criminal activity, including murders, assaults, and kidnappings, as committing acts of violence is required to maintain membership. MS-13 members

1

commonly recite the phrase "mata, viola, controla," which means "kill, rape, control." MS-13 is organized into smaller subsets, known as "cliques," which work cooperatively to commit violent acts.

The Defendants in this trial are Wilson Arturo CONSTANZA-Galdomez, Edis Omar VALENZUELA-Rodriguez, and Jonathan PESQUERA-Puerto. Defendants CONSTANZA and VALENZUELA are charged in a superseding indictment with the following offenses: one count of conspiracy to participate in a racketeering enterprise; and two counts of murder in aid of racketeering. Defendant PESQUERA is charged in a superseding indictment with the following offenses: one count of conspiracy to participate in a racketeering enterprise; and one count of murder in aid of racketeering.

The Defendants in this case are members and associates of violent subsets of the MS-13 gang that operate in and around the state of Maryland, to include Huntington Criminales Locos Salvatrucha ("HCLS" or "Huntington"), Virginia Locos Salvatrucha ("VLS"), Carlington Locos Salvatrucha ("CALS"), and Hempstead Locos Salvatrucha ("HLS" or "Hempstead").

The Defendants' conduct as alleged in the Superseding Indictment occurred primarily in 2020. The Defendants are alleged to have committed two murders, multiple attempted murders, assaults, and street-level drug trafficking, in and around Baltimore, including in Macon Street in Baltimore, Maryland; Patterson Park, in Baltimore, Maryland; a park near Loch Raven reservoir, in Cockeysville, Maryland; the CSX Bayview Yard in Baltimore, Maryland; and, Dundalk, Maryland.

A six-week trial in this case is scheduled to begin on September 2, 2025. The anticipated evidence at trial will include testimony from civilian witnesses and victims who were involved in the above-described murders, attempted murders, and other racketeering acts.

Some of the anticipated witnesses directly participated in the criminal conduct. These witnesses are former members and associates of MS-13 who will be testifying pursuant to cooperation agreements with the United States. These witnesses are currently in custody and are awaiting sentencing or have already been sentenced. In addition, there are several other civilian witnesses who are expected to testify in this case that are not in custody.

MS-13 strictly prohibits cooperation with law enforcement. MS-13 members understand that the gang punishes with death any member or other person who cooperates with law enforcement against the gang. The gang also venerates those members who have killed law enforcement cooperators. The process of obtaining authorization to kill a disobedient gang member, a rival gang member, or a suspected law enforcement cooperator is known as "green lighting;" when an individual is ordered to be killed, he or she is said to be "green lit." Obtaining a "green light" typically requires the authorization of a clique leader and, in some cases, approval from gang leaders in California or El Salvador.

As explained below, revealing the locations of the civilian witnesses, including the victims or their families, will pose a serious security threat to those individuals. In addition, the Court should restrict the Defendants from presenting evidence of the penalties they face, including by limiting the cross-examination of cooperating defendants.

**ARGUMENT**

I.  **The Court should prohibit the Defense from inquiring into the location of witnesses and witnesses' families.**

The United State seeks an order prohibiting the Defense from inquiring into the current location of any witness in this case—whether in custody or out of custody—as well as the locations of the witnesses' family members. Permitting the disclosure of the locations of this information unnecessarily exposes these witnesses and their families to serious danger from retaliation.

3

Although "inquiry regarding a witness' full name and place of residence is normally allowed on cross-examination," it is within a court's discretion to "limit cross examination when the information sought may endanger a witness' safety." *United States v. Zelaya*, 336 F. App'x 355, 358 (4th Cir. 2009) (citing *Chavis v. State of N.C.*, 637 F.2d 213, 226 (4th Cir. 1980)). "The government bears the burden of proving that such a threat exists." *See id.* (upholding district court's decision to prohibit questioning regarding true names of witnesses in MS-13 trial); *see also United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969) ("[W]here there is a threat to the life of the witness, the right of the defendant to have the witness' true name, address, and place of employment is not absolute.").

One of the primary rules under which MS-13 operates is the rule against cooperating with law enforcement. For those who cooperate, the punishment is death. The risk of retaliation and death against the cooperating witnesses in this case is not merely conjecture.

For example, on May 24, 2024, a search of the jail cell housing defendant Wilson Arturo Constanza-Galdomez revealed three homemade weapons, each approximately 27 inches in length and 2.5 to 3 inches in width, concealed beneath the bunk's storage area within a hollowed-out seam. It is therefore significant that one of the Defendants was caught in a secure jail facility in possession of three home-made knives. This demonstrates an ability to harm individuals with whom the Defendant was incarcerated. Moreover, some of the anticipated evidence at trial is expected to show that some of the victims included in the Superseding Indictment were targeted because gang members believed they were going to talk to law enforcement and implicate MS-13 gang members in criminal activity.

With almost no exception, every civilian witness who is expected to testify in this case has expressed fear of retaliation by MS-13 against themselves and their families.

Given the extensive contributions to this and other law enforcement investigations into MS-13 and its various cliques, and the known threats the witnesses and their families would face if their residences or locations were revealed, disclosure of such information poses a very real danger of harm. Accordingly, the Court should prohibit the Defense from inquiring into the location of any witness or witness's family in this case.

**II.    The Court should preclude the Defense from presenting evidence or argument regarding the potential penalties the Defendants face if convicted, as well as the penalties the cooperating witnesses faced absent cooperation.**

The United States moves to preclude the Defendants from presenting evidence or argument regarding potential penalties the Defendants face if convicted. The United States also moves to prohibit the Defendants from presenting evidence during cross-examination of cooperating witnesses about the specific penalties those witnesses faced absent their cooperation as doing so would reveal the Defendants' penalties.

"It is well established that when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 578 (1994) (quoting *Rogers v United States*, 422 U.S. 35, 40 (1975)). "Absent a statutory requirement that the jury participate in the sentencing decision, nothing is left for jury determination beyond the guilt or innocence of an accused." *United States v. Greer*, 620 F.2d 1383, 1384 (10th Cir. 1980) (internal quotation marks omitted) (citation omitted) ("The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial."). Indeed, information about penalties draws the attention of the jury away from their chief function as the sole judge of the facts, opens the door to compromised verdicts, and confuses the issues to be decided. *See United States v. Olano*, 62 F.3d 1180, 1202 (9th Cir. 1995).

These principles apply equally to the notion that the Defendants should not be permitted to elicit, during the cross-examination of a cooperating witness, testimony about the penalties the witness avoided by accepting a cooperation plea and agreeing to testify at trial. Indeed, if the Defendants are permitted to present evidence of the penalties the cooperating witnesses faced— several of whom were charged with the same crimes as the Defendants—the jury will know that the Defendants face those same penalties. Certainly, there should be no mention by the Defense that the death penalty could have been sought as to any witness in connection with the charges in this case or that a conviction for certain counts would have required the imposition of a mandatory life sentence.

> As the United States District Court for the Eastern District of Michigan has pointed out:
>
> The majority of circuit courts which have addressed the issue have held that a defendant's confrontation rights are not violated by restrictions that prevent inquiry into potential or maximum sentences that a cooperating witness avoided (or hopes to avoid) by testifying at trial where there is other testimony from which the jury can assess the witness's credibility. Those courts find that such sentencing information is only marginally relevant and its benefits are outweighed by the risk of jury confusion or jury nullification.

*Little v. Warren*, No. 2:14-CV-10166, 2015 WL 6108248, at *5 (E.D. Mich. Oct. 16, 2015) (collecting cases).

To be sure, the Defendants are entitled to cross-examine the cooperating witnesses about the potential reduction in sentence they are hoping to receive as part of their cooperation plea agreements. However, the impeachment can be readily accomplished by having the cooperating witnesses confirm that he or she was facing "significant," "substantial," "lengthy," or "considerable" periods of incarceration and that, as part of the plea agreement, he or she hoped to receive a reduced sentence. Accordingly, the Court should preclude the Defense from presenting evidence or argument regarding the potential penalties the Defendants face if convicted, as well as the maximum penalties facing the cooperating witnesses.

## **CONCLUSION**

For the foregoing reasons, the United States requests that the Court grant the above-described *Motions in Limine*.

                                      Respectfully submitted,

                                      Kelly O. Hayes
                                      United States Attorney

By:       /s/
                                      Alex Kalim
                                      Assistant United States Attorney